LOTTINGER, Judge.
This is a suit for workmen’s compensation against the employer and his insurer. The suit against the employer was subsequently dismissed. Therefore the insurer is the sole defendant left in this case. The Lower Court, after first assigning reasons for judgment in favor of plaintiff, awarding him compensation for total and permanent disability, reversed itself on motion for rehearing and assigned further written reasons and held that plaintiff was not injured while engaged in the trade, business, or occupation of the employer and rendered judgment for defendant, insurer, rejecting plaintiff’s demand. From this judgment plaintiff prosecutes this devolutive appeal.
It is not denied that the plaintiff was hurt while working as an employee for defendant’s insured and there is no serious dispute that plaintiff is crippled as a result of his injury. There is no dispute that the employment in which the plaintiff was then participating was hazardous.
Plaintiff contends that he is entitled to recover because he was injured while doing carpentry work for his employer in his employer’s trade, business or occupation in demolishing a building and that he is further entitled to recover because the demolishing of the building was in connection with the regular business of a filling station owned *444 by his employer which is covered by our Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq. Plaintiff contends further that he is entitled to recover because the defendant Globe Indemnity Company had issued a workmen’s compensation policy to his employer, Hiram Fuselier, covering his employees, on the date of the accident, in his employer’s operation of an automobile service station and wrecking of buildings. The first question to be determined therefore is: Was plaintiff engaged in a trade, business or occupation of the employer at the time of the accident or more specifically was the employer’s activity in demolishing a building a trade, business or occupation of the employer Fuselier or, if not, was such activity connected with the employer’s regular trade, business or occupation of conducting a filling station under our Compensation Act?
The record amply supports the factual findings of the trial judge and we believe as did the Lower Court that the plaintiff was injured on April 14, 19S3, while tearing down a building in Elton, Louisiana, for and on behalf of defendant’s insured. He was on top of the building when the rafters collapsed and he fell with the building. He was pinned under some heavy' timber and knocked unconscious and remained in that condition until the next day. Plaintiff is the father-in-law of Hiram Fuselier, defendant’s insured and had been working for Mr. Fuselier off and on for the past several years. Some of the time he worked as a carpenter and some times as a handy man in Mr. Fuselier’s filling station. In between times however plaintiff worked for other employers. Defendant’s insured owned and operated in Elton, Louisiana, a filling station, a grocery store, had a half interest in a saloon, one rent house and a large building which had previously been used as the Elton Trade School. These were all separate establishments however. It appears that the trade school building was nonrevenue bearing and not in use at the time and due to the further fact that the building was beginning to get in'need of repair, it was Mr. Fuselier’s intention to demolish said trade school building and use some of the salvaged lumber to build a store room for the saloon and the remaining lumber to be used in a home for himself. Plaintiff and his employer Mr. Fuselier and three other employees were in the process of tearing down this trade school building when the accident occurred. It appears further that at the same time they were demolishing the trade school building, Mr. Fuselier with the help of his employees was constructing a small store room to the saloon and after the trade school building was completely torn down the remainder of the salvaged lumber was placed under a shed. It further appears that some time in January, 1954, or some nine months after the accident, that Mr. Fuselier, the employer, used some of this salvaged lumber to repair the roof of the filling station and to make other repairs to the grocery store building. It further appears from the facts found in this record that the home Mr. Fuselier intended to build with this salvaged lumber was never built and that the lumber is still stored in the shed where originally placed. This record further indicates that Globe Indemnity Company paid compensation to plaintiff for some 17 weeks but that no compensation has been paid since August 11, 1953. Some time during the month of August an adjuster of Globe Indemnity Company secured a statement from Mr. Fuselier which we quote in part as follows:
“I am Hiram Fuselier, white, male, age thirty-eight, married, home address Elton, Louisiana, Box 403. I am in the service station and grocery business in Elton. I own and operate the Fuse-lier Service Station and Grocery in Elton, Louisiana. I have a half interest in a bar and pool room also in Elton, Louisiana.
“Some time in the month of April, 1953 I had employed Christopher Landry, my father-in-law, of Elton to help tear down a building on Main Street in Elton. The building was used as a trade school for ex-service men and I had a half interest in the building. The trade school ended and I bought the other half and I owned all the *445 building. I wanted to tear this old trade school building down and I was going to use the lumber in building a home for myself at another location in Elton. I hired to work with Christopher Landry a Negro man by the name of Richard Thomas of Elton. I was helping these two men tear this building down on about April 14, 1953, when the building rafters gave way and Christopher Landry and Richard Thomas were injured.”
After this accident occurred the insurer canceled its policy of workmen’s compensation with the assured and we find filed in this record payroll audit statements on said workmen’s compensation policy as well as on previous policies previously issued to this assured. Under exhibit “P2” which is a payroll audit statement on policy No. CS 934148 covering the effective date of said policy from January 31, 1950 to January 31, 1951, which shows the gas station having a payroll for said period of $1,716 and carpentry $170. Likewise under exhibit “P3” a payroll audit statement covering the policy that was in effect at the time of the accident for the period from January 31, 1953 to May 25, 1953, for auto service station a payroll of $256 and wrecking of building a payroll of $80. The plaintiff and the employer, Hiram Fuselier, contend in their testimony that Hiram Fuselier was in the carpentry and wrecking of building business. Be that as it may, however, we find that prior to the demolishing of this trade school building Hiram Fuselier had only made some minor repairs to the buildings owned by him and one small addition to one of his buildings in 1950 or 1951. It does not appear that he ever maintained anyone on his payroll as a repair man or carpenter to do carpentry work or demolish buildings. Taking that into account in connection with the payroll audit statements that we find in this record, which show only a nominal sum expended for such work, we must come to the conclusion that Mr. Fuse-lier was not in the carpentry or wrecking business.
The next question that is pertinent to the issue involved here is whether or not this building was being demolished by Mr. Fuse-lier in connection with his regular business of a filling station. There is nothing in this record which indicates in any manner that the saloon to which the store room was added from the salvaged lumber is in any way a hazardous business because we must remember that at the time the building was demolished some of the demolished lumber was used to build a store room in connection with the saloon but that none of the lumber was used in connection with making repairs to the filling station or store until some time in January 1954. Therefore the problem at issue appears to us to be, what was the intent of Mr. Fuselier at the time the trade school building was being demolished; what was his primary intent in demolishing the trade school building; was it to build a storage room for the saloon and the remainder to be used in a home for himself or was it to build a store room for the saloon and to make the then necessary repairs for the filling station and grocery store and the remainder to be used as a home.
According to Mr. Fuselier’s testimony as found in this record, we find the statement as is hereinabove partly quoted to the effect that he tore the building down with the intention of building a home for himself and according to his testimony in the record we find that he used some of the lumber to build his store room to the saloon and the store room was built during the time that the building was being demolished and that he stored the rest of the lumber under a shed to use in his home; that he subsequently in January 1954 used some of the lumber to repair his filling station and grocery store. His testimony is absolutely devoid of any statement to the effect that he tore the building down for the purpose of using any of it in his filling station.
The plaintiff, who is the father-in-law of Mr. Fuselier, states that when the trade school building was being demolished some of the salvaged lumber was used to build an addition to the saloon and the remainder was stored in a shed. Some of the lumber was used to repair the filling station and grocery store in January 1954 but it was *446 his understanding' that his son-in-law tore this building down to use some of the lumber to build a home. He further states that he did not know that any of this lumber would be used in the filling station or grocery store until it was actually used in January of 1954.
Mrs. Hiram Fuselier, the daughter of plaintiff, testified in part as follows under direct examination:
"Q. Can you tell us what the lumber was used for that you salvaged out of this wrecked building? A. Yes, sir.
“Q. What was this, please? A. Well, as they were tearing down the building — it was tore down, started on April 6 — and as they would tear it down, they would rebuild storage rooms to the Elton Saloon, and they usually used it to repair the roof of his store and the roof of his filling station, and then, now that that is torn down he used some of that lumber from the old building that they were tearing down on April 14 to rebuild a temporary store.
“Q. Now, when your husband testified and Mr. Landry testified that he thought that he would use some of this lumber — by, when I say he, I mean your husband — for building your home, was that an absolute crystallized plan to put it into your home or was it just something that you' were thinking about that might work out or might not work out? A. They had to undo the building. It needed repair, and as they were undoing it, they were going to build this storage room and if there was any good ones left over, he was going to use it for a home, but which he did not because we haven’t built a home.
“Q. I know. Now, did he ever express that intention to use this lumber or to expand the filling station and so forth before the tearing down of the building? A. Naturally, he was going to use some for repair.
“Q. And he expressed that to you before— A. Yes, sir.
“Q. —the accident? A. Yes, sir.”
It appears from the testimony of Mrs. Fuselier that the primary intention of tearing this building down was to build this store room and what was left was to be used in a home. It is true that in answer to a direct leading question she did finally state that it was her husband’s intention to demolish the building so as to build this store room and make the necessary repairs to the filling station but according to the testimony of her husband, Mr. Fuselier, he failed to corroborate her in this respect as he never made any statement that the building was demolished with the primary intention of using the salvaged lumber in the filling station. The next witness who testified for the plaintiff was Richard Thomas, one of the employees of Mr. Fuselier, who was likewise injured when the building collapsed and he says that it was his understanding that they were tearing the building down to build or repair a home for Mr. Fuselier.
Mr. and Mrs. Fuselier both state that the statement that they gave to the adjuster is true as far as it went but that it did not go far enough as it did not cover everything. By that they explained that the adjuster did not ask them about their other intent as to what else they expected to do with the salvaged lumber. Be that as it may however, they do not deny the fact that they told the adjuster that they wanted to tear the old trade school building down for the reason they were going to use the lumber to build a home for themselves in another location in Elton. It appears to us that if their primary intention of tearing the old trade school building down was to build an addition to the saloon and make the then necessary repairs to the filling station and store that they would have so stated to the adjuster and that they would not have left the statement unfinished if that was their primary intention.
The Lower Court found that at the time the building- was being demolished it was Mr. Fuselier’s plan to use the salvaged lum *447 ber and material to build a home for himself and that he planned to do this in order to save money. We are inclined to agree and do agree with the Lower Court that the primary intention and plan of Mr. Fuselier in demolishing this building was to build this store room for the saloon and the remaining lumber to be eventually used in a home for himself. It so develops however that some nine months after the building was demolished or in January 1954 Mr. Fuselier does use some of this salvaged lumber in his filling station business which according to the record is his only hazardous trade, business or occupation.
It may be well to point out that this suit was filed on November 16, 1953, some seven months after the accident and that at the time this suit was-‘filed none of the salvaged lumber had at that time been used in connection with the filling station or hazardous trade, business or occupation of Mr. Fuselier. Considering all of these factors and finding no manifest error in the findings of fact of the Lower Court we must agree and concur with the Judge of the Lower Court that the demolishing of the building was not in connection with the regular business of Mr. Fuselier.
For plaintiff to obtain recovery herein he must prove by a preponderance of the evidence that the intent, purpose and plan of Mr. Fuselier, in demolishing the building, was for and connected with his employer’s hazardous trade, business or occupation. In this we believe he has failed to do.
We believe the jurisprudence of this state is well established to the effect that if the principal occupation of employer is hazardous and employee is employed in an incidental capacity with reference to and in connection with said occupation, which is also hazardous, then compensation is allowed. Or in other words where the operator of an admittedly hazardous business, in the conduct of that business undertakes repair, whether it be of the building housing the same or the equipment therein, rather than have it done under contract, his employees come under the protection of the employer’s liability laws of this state. See Speed v. Page, 222 La. 529, 62 So.2d 824, Hecker v. Betz, La.App., 172 So. 816 and Gonsoulin v. Southern Amusement Company, La.App. 32 So.2d 94. On the other hand however if the principal business of employer is nonhazardous and the incidental business or work is hazardous then the courts have not granted recovery, LSA-R.S. 23:1035; Shipp v. Bordelon, 152 La. 795, 94 So. 399; Story v. Globe Indemnity Company, La.App., 61 So.2d 582 and 223 La. 689, 66 So.2d 611; Caldwell v. George Sproull Company, 184 La. 951, 168 So. 112; Brooks v. Smith, La.App., 41 So.2d 800; Prater v. Sun Indemnity Company of New York, La.App., 38 So.2d 663.
It is interesting to note what the Supreme Court said in the case of Shipp v. Bordelon, cited supra [152 La. 795, 94 So. 400], which we quote as follows':
“We agree with counsel that it is not required, under our law, that the business of the employer must be exclusive, for one may have a dozen trades, businesses, or occupations. But, to become liable for compensation, he must be actually so engaged, as a trade, etc., and it is not enough that the work done should be hazardous if it be not also incident to or in the course of the trade, business, or occupation of the employer which is within itself hazardous under the statute.”
 Mr. Malone on Louisiana Workmen’s Compensation Law and Practice in Section 102 offers a discussion of LSA-R.S. 23 :1035 which we firmly believe to be correct and we quote:
“The Compensation Act does not extend to injured employees unless their work is a regular part of the business, trade or occupation of the employer. This requirement is separate from and in addition to the requirement concerning the hazardous nature of the business and the employment. The failure *448 of the courts clearly to recognize this separation in some of the decisions has given rise to confusion.
“This special requirement expresses a part of the underlying philosophy of the compensation principle. The business of the employer is expected to bear the cost of the risk of injury to those who serve the business. Therefore, only so long as the work of the employee is a part of the business of the employer is the application of compensation justifiable.”
Having concluded hereinabove that the business of the saloon and grocery store of the employer was not hazardous as found in this record and having further concluded as hereinabove stated that the work done while demolishing the trade school building was not in connection with the operation of the hazardous business of the filling station, we therefore concluded that the employee or plaintiff herein is not entitled to recovery.
Having disposed of those issues we now come to the final contention of plaintiff and that is that he is entitled to recovery because the defendant Globe Indemnity Company had issued to Hiram Fuselier, the plaintiff’s employer, a workmen’s compensation policy, covering his employees on the date of the accident, on his employer’s operation of an automobile service station and wrecking of buildings business.
This question likewise appears to have been well settled in the jurisprudence of this state in the following cases: Smith v. Crossett Lumber Company, La.App., 72 So.2d 895; Franz v. Sun Indemnity Company, La.App., 7 So.2d 636; Benjamin v. Standard Accident Insurance Company, 152 La. 874, 94 So. 428; Rutland v. General Accident Fire and Life Assurance Corp., La.App., 200 So. 486 and Prater v. Sun Indemnity Company, La.App., 38 So.2d 663. The Orleans Court of Appeal acting through Judge Janvier in the case of Franz v. Sun Indemnity Company of New York, cited supra [7 So.2d 638], discussed the matter and cases in great length and we quote the following from said decision:
“If by the issuance of a policy in which it agreed to indemnify the employer corporation against loss drie to liability for compensation and by the acceptance of a premium therefor the insurer estopped itself to contend that the employer, because of the nature of its business, could not be liable in compensation, then that is an end of the entire matter so we should first consider that contention, which is in the nature of a plea of estoppel. In the first place, it should be noted that in the policy there is no clause or stipulation which in any sense imposes on the insurer any liability other or greater than that which by law could be imposed upon the employer. The policy is simply an agreement that if the employer becomes liable in compensation to an employee, or to his dependents, the insurer will assume that liability. It is true that it does contain a stipulation that the insurer will make payment directly to the employee or to his dependents and that the employee or his dependents may sue the insurer directly and without the necessity of making the employer a defendant. But this stipulation results from the law which gives these rights where there is a policy and which provides that though no insurance need be obtained by the employer, if it is secured, the insurer must make itself liable directly to the employees provided there is liability in the employer. These stipulations do not in any way nor does the law in any way create against the insurer a cause of action where none exists against the employer. And we know of no reason which would justify the view that the acceptance of a premium operates as an es-toppel and prevents the insurer from contending that there can be no liability. It may well be that the nature of a business is such that its operator and the insurer may both feel reasonably certain that it is not within the con *449 templation of the workmen’s compensation statute, and' yet that there is a possibility that the courts may differ from them if and when a claim in compensation arises. Why, under such circumstances, should the employer not be permitted to make certain of his own protection by purchasing insurance without, by so doing, cutting off from the insurer the right to make the defense which both think is perfectly sound; that the employment is not hazardous? The statute itself contemplates that no such estoppel shall result for it provides that even the furnishing of medical service or the making of payments by the employer or by the insurer shall not constitute an admission of. liability: ‘Neither the furnishing of medical services nor payments by the employer or his insurance carrier shall constitute an admission of liability for compensation under this Act.’ Sec. 4408, Par. S, p. 384, Dart’s Louisiana General Statutes, Vol. 3, Act No. 20 of 1914, § 18, subd. 5, as amended by Act No. 85 of 1926 [LSA-R.S. 23:1204].
“It will be noted that there is no limitation in this provision. Even after the furnishing of medical services or even after the making of a payment the employer or the insurer may still set up as a defense any contention; even that, because of the nature of the employer’s business, the employer is not within the contemplation of the statute. In Benjamin v. Standard Accident Insurance Co. of Detroit, 152 La. 874, 94 So. 428, 429, the Supreme Court expressed the view that the issuance of a policy does not make the insurer liable unless the employer could have been held. That was a suit under this statute. It was held that the business of that employer was not hazardous. The court said: ‘ * * * The reason plaintiff cannot recover under the Workman’s Compensation Act is that the employment was not dangerous, and that there was no agreement in writing that the parties should come under the’ act. * * * ’
“But on behalf of plaintiff it was contended that this defense should not be available to the insurer since the insurer had issued a policy of workmen’s compensation insurance. The court said: ‘ * * * but from that fact does not result in favor of plaintiff a right of action under the Workman’s Compensation Act. Plaintiff had no right of action under the act against the employer, and has none against the surety of the employer.’
“See also Rutland v. General Accident Fire & Life Assur. Corp., [La. App.], 200 So. 486, 488, in which our brothers of the First Circuit said: ‘ * * * there only remains now the question as to plaintiff’s right of action against the defendant, insurance company, Gillespie’s surety under the contract of insurance; That question might be the source of further controversy in the case were it not for the fact that the Supreme Court has already specifically held that where an employee has no right of action under the Statute against the employer, he has none against the employer’s surety. This ruling was made in the case of Benjamin v. Standard Accident Insurance Co., 152 La. 874, 94 So. 428. * * *>»
Therefore for the above and foregoing reasons the , judgment appealed from is hereby affirmed.
Judgment affirmed.